# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BRENDA MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 2:10-00070** |
| **v.** | ) | **Judge Wiseman / Knowles** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 15. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 17. Plaintiff has filed a Response to Defendant's Response to Plaintiff's Motion for Judgment, which the Court will construe as a Reply. Docket No. 18. Defendant has filed a Sur-reply. Docket No. 21.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

# I.  INTRODUCTION

Plaintiff filed her applications for DIB and SSI on February 6, 2007[1], alleging that she had been disabled since July 1, 2005, due to obesity, residual foot pain from a previous foot fracture, neck pain, back pain, knee pain, acid reflux, diabetes, stroke, migraines, stomach problems, arthritis, anxiety, and depression.  Docket No. 13, Attachment ("TR"), TR 65, 67, 122, 130, 161.  Plaintiff's applications were denied both initially (TR 41, 42) and upon reconsideration (TR 43, 44).  Plaintiff subsequently requested (TR 82) and received (TR 16-39) a hearing.  Plaintiff's hearing was conducted on May 4, 2009, by Administrative Law Judge ("ALJ") Robert L. Erwin.  TR 16.  Plaintiff and vocational expert ("VE"), Ernest Brewer, appeared and testified.  TR 16-17.

On June 23, 2009, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 45-61.  Specifically, the ALJ made the following findings of fact:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.
>
> 2.  The claimant has not engaged in substantial gainful activity since July 1, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3.  The claimant has the following severe impairments: degenerative disc disease; obesity; residual foot pain; status post cerebrovascular accidents; migraine headaches; high blood pressure; diabetes; and depression (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.  The claimant does not have an impairment or combination

---

[1]Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits on January 16, 2007.  TR 48, *referencing* TR 41, 42.

of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally, and 10 pounds frequently.  She should not do any job requiring any climbing of ropes, ladders, or scaffolds.  She could stand or walk two to four hours in an eight hour work day; and sit up to six to eight hours in an eight hour work day.  Due to the claimant's pain that she experiences from other difficulties that cause her problems, she would have the following functional capacity for mental and emotional areas.  The claimant would be able to understand, remember and carryout [*sic*] detailed, but not complex tasks.  She will have difficulty but can sustain attention and concentration, keep to a schedule, maintain attendance, and complete a workweek.  She would have some difficulty working around others, to include the general public, co-workers, and supervisors, but can do these things.  She can handle changes in the work setting, set realistic goals, and avoid hazards in the work place.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on March 21, 1965 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy

that the claimant can perform (20 CFR 404.1569,
404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in
the Social Security Act, from July 1, 2005 through the date
of this decision (20 CFR 404.1520(g) and 416.920(g)).

TR 50-60.

On August 14, 2009, Plaintiff timely filed a request for review of the hearing decision.

TR 8.  On May 15, 2010, the Appeals Council issued a letter declining to review the case (TR 1-
3), thereby rendering the decision of the ALJ the final decision of the Commissioner.  This civil

action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. §§ 405(g) and

1383(c)(3).  If the Commissioner's findings are supported by substantial evidence, based upon

the record as a whole, then these findings are conclusive.  *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and

testimonial evidence of Record.  Accordingly, the Court will discuss those matters only to the

extent necessary to analyze the parties' arguments.

## III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the

administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The

purpose of this review is to determine (1) whether substantial evidence exists in the record to

support the Commissioner's decision, and (2) whether any legal errors were committed in the

process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept

as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a

5

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful

activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's

age, education, and work experience, any other relevant work that exists in the national economy

in significant numbers regardless of whether such work exists in the immediate area in which

Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he

or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

(1)  If the claimant is working and the work constitutes substantial
gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which
significantly limits his or her ability to work (a "severe"
impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it
must be determined whether he or she suffers from one of the
"listed" impairments[2] or its equivalent. If a listing is met or
equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level
impairments, it must be determined whether the claimant can
return to the job he or she previously held in light of his or her
residual functional capacity (e.g., what the claimant can still do
despite his or her limitations). By showing a medical condition
that prevents him or her from returning to such past relevant work,
the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability,
the burden shifts to the Commissioner to establish the claimant's
ability to work by proving the existence of a significant number of
jobs in the national economy which the claimant could perform,
given his or her age, experience, education, and residual functional

_____

[2]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff alleges that the ALJ's decision was not supported by substantial evidence because his findings "are clearly contrary to the objective findings on a number of the claimant's medical conditions and these misstatements of the medical evidence were often cited as the bases for [his] conclusions."  Docket No. 16.  Specifically, Plaintiff contends that: (1) the ALJ

improperly assigned controlling weight to the consultative examiner's opinion, rather than to the opinion of her treating physician; (2) the ALJ failed to evaluate all of her impairments in combination; (3) the ALJ erroneously concluded that Plaintiff's impairments did not meet or equal Listing 1.04A; (4) the ALJ improperly evaluated Plaintiff's residual functional capacity; and (5) Plaintiff was prejudiced by a filing error by the Appeals Council.[3] *Id.* Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

## 1. Weight Accorded to the Opinion of Plaintiff's Treating Physician

---

[3]Plaintiff also argues that she should have been allowed to amend her onset date to that of her May 2007 MRI. Docket No. 16. Because Plaintiff never actually requested to amend her alleged onset date, however, no error was committed by the ALJ.

Plaintiff maintains that the ALJ erroneously accepted the findings of the consultative medical examiner and the State agency physicians, rather than the findings of her treating physician, Dr. Stephen Pribanich. Docket Nos. 16, 18. Specifically, Plaintiff argues that the consultative medical examiner's opinion has "no probative value" because he rendered his opinion one month before she underwent an MRI and two months before she had back surgery, whereas Dr. Pribanich completed his May 1, 2009 assessment after Plaintiff's surgery. *Id.* Plaintiff essentially argues that the lack of surgical and recovery records before the consultative medical examiner and State agency physicians renders their opinions void, such that the ALJ should have adopted Dr. Pribanich's May 1, 2009 opinion and accorded it controlling weight. *Id.*

Defendant responds that the ALJ properly considered Dr. Pribanich's opinion and that the ALJ's decision not to accord controlling weight to Dr. Pribanich's opinion is supported by substantial evidence. Docket Nos. 17, 21.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from

reports of individual examinations, such as consultative
examinations or brief hospitalizations.  If we find that a treating
source's opinion on the issue(s) of the nature and severity of your
impairment(s) is well-supported by medically acceptable clinical
and laboratory diagnostic techniques *and is not inconsistent with
the other substantial evidence in your case record*, we will give it
controlling weight.  When we do not give the treating source's
opinion controlling weight, we apply the factors listed in
paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the
factors in paragraphs (d)(3) through (d)(6) of this section in
determining the weight to give the opinion. ...
     (3) Supportability.  The more a medical source presents
relevant evidence to support an opinion, particularly medical signs
and laboratory findings, the more weight we will give that opinion.
The better an explanation a source provides for an opinion, the
more weight we will give that opinion. ...
     (4) Consistency.  Generally, the more consistent an opinion
is with the record as a whole, the more weight we will give to that
opinion.
     (5) Specialization.  We generally give more weight to the
opinion of a specialist about medical issues related to his or her
area of specialty than to the opinion of a source who is not a
specialist.
     ...

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis

for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of

Federal Regulations defines a "treating source" as:

[Y]our own physician, psychologist, or other acceptable medical
source who provides you or has provided you, with medical
treatment or evaluation and who has, or has had, an ongoing
treatment relationship with you.

20 C.F.R. § 404.1502.  An ALJ may consider the opinion of a non-examining physician

designated by the Secretary in determining whether a claimant has medically determinable

impairments.  *Reynolds v. Secretary*, 707 F.2d 927, 930 (6th Cir. 1983).

It is undisputed that Dr. Pribanich has treated Plaintiff for many years and is a treating

physician.  On May 1, 2009, Dr. Pribanich completed a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" form regarding Plaintiff, which stated that, within an eight-hour workday, Plaintiff could lift and/or carry no more than five pounds, could stand and/or walk for no more than fifteen minutes without interruption, and could sit for one to two hours without interruption.  TR 57, 553-55.  In that assessment, Dr. Pribanich also opined that Plaintiff could never climb, stoop, kneel, balance, crouch, or crawl.  TR 57, 554.  Regarding Plaintiff's "physical functions," Dr. Pribanich opined that Plaintiff's reaching, handling, feeling, and pushing/pulling were affected by her impairments, while her seeing, hearing, and speaking were not.  TR 57, 554.  Dr. Pribanich noted that Plaintiff's impairments resulted in the environmental limitations of needing to avoid heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibration.  TR 57, 555.

The ALJ did not accept the opinion of Dr. Pribanich as expressed in his May 1, 2009 assessment.  TR 58.  While Plaintiff's contention that the consultative examiner and State agency physicians rendered their opinions prior to her MRI and surgery is factually accurate, the ALJ made his findings "[a]fter careful consideration of the entire record," including Dr. Pribanich's post-surgery treatment records which were provided after those opinions were issued.  TR 50, 51, 55.  In rejecting Dr. Pribanich's assessment, the ALJ articulated the following rationale:

> The undersigned does not find Dr. Pribanich's determinations credible with regard to the claimant's ability do work related activities.  His conclusions are inconsistent with his treatment record leading up to this point.  He did not provide documentation of a clinical examination of the claimant and the findings are not supported by objective medical findings or treating progress notes of record.  Specifically, Dr. Pribanich only noted blanket findings of "diffuse disc disease, osteoarthritis and fibromyalgias; chronic weakness and pain in limbs; constantly must shift position to be comfortable; morbid obesity; mental illness; neuropathy; chronic

11

lung disease; and throat cancer." Thus, these conclusions are tenuous and not supported by current, objective findings. Moreover, these conclusions are inconsistent with the medical evidence of record. The medical evidence of record does not support these conclusions. Accordingly, the undersigned does not accept Dr. Pribanich's conclusions with regard to the claimant's residual functional capacity.

TR 57-58 (internal citations omitted).

Regarding Dr. Pribanich's treatment notes, the ALJ stated:

The medical evidence of record shows that in 2004 the claimant was diagnosed with back pain. The claimant's primary care physician, Steven Pribanich, M.D., had X-rays of the thoracic spine done in November 2004 which showed mild to moderate degenerative disc disease present from T9 to T12 to L1-2. Dr. Pribanich diagnosed arthritis and noted that at about the T9 to T12 level there were disc related changes with mild to moderate disc narrowing. An MRI scan of the spine in December 2004 revealed some spurring of the spine, but no compression upon the cord.

In December 2006 the claimant complained of bodyaches [*sic*], arthritis in hands-knees, and left foot pain to Dr. Pribanich, who again diagnosed arthritis, and referred the claimant to an orthopedic specialist for her foot. Dr. Pribanich noted that the claimant's spine was within normal limits. The middle spine was within normal limits, with no kyphosis. The lower spine was within normal limits, with no scoliosis. The right and left shoulders were within normal limits. The right elbow was within normal limits. The right and left hands were within normal limits. The right and left hips were within normal limits. The right and left knees were within normal limits. The right foot and ankle were within normal limits. The left foot and ankle were within normal limits; and the left foot/ankle had a normal range of motion. But, the left foot/ankle also revealed "painful screw on palpitation". [*sic*] The claimant did show some crackling in lower joints on examination. The claimant was followed with additional lab tests. She did not require any significant treatment and was counseled as to diagnosis, medications, diet and activity.

. . .

At annual check-up examinations in January and December 2008, Dr. Pribanich found the claimant's musculoskeletal system "normal." After finding normal results in a clinical examination of the claimant in February 2009, Dr. Pribanich's treatment notes report that the claimant had experienced back pain and spasms for a few weeks secondary to exercising to a "Richard Simmons" video. Dr. Pribanich diagnosed lumbago; and further noted that the claimant had a full range of motion of the lumbar spine, with lumbar spine flexion to 100 degrees, lumbar spine extension to 0 degrees, side flexion lumbar spine 30 degrees on the left, and side flexion lumbar spine 30 degrees on the right. . . .

. . .

. . . In April 2004, Dr. Pribanich treated the claimant for a possible right cerebral vascular accident (CVA) with left-sided weakness, with possible relation to recent headaches. Dr. Pribanich opined that the claimant may have had some type of migraine variant; and since the headaches seemed to have resolved, there could have been a relationship to cerebral vascular accident.

. . . The claimant's physical examinations with Dr. Pribanich during 2008 and 2009 were unremarkable for any findings, diagnoses, or treatment for migraine headaches, except for noting the claimant's continuing use of daily Topamax medication. . . .

. . .

. . . Nor do the treatment notes reflect that the claimant discussed seizures in follow-up physical examinations with Dr. Pribanich in 2008 and 2009. . . . Nor has the claimant been placed under a treatment protocol for seizures by any treating physician. . . .

. . .

. . . In a 2008 treatment note, Dr. Pribanich specifically stated that there was not any shortness of breath (i.e., "no exertional SSCP or SOB") reported. . . .

. . .

. . . An annual physical examination, on January 18, 2008, by the claimant's primary care physician, reported for the

musculoskeletal portion that the range of motion of all major joints was within normal limits, with no acute deformity or angulation of any of the major joints. Notes from a physical examination, on February 25, 2009, by the claimant's primary care physician, reported the claimant had full range of motion of the lumbar spine. . . .

TR 50-55 (internal citations omitted).

Plaintiff correctly states that Dr. Pribanich treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to his opinion than to other opinions. As the ALJ noted, however, Dr. Pribanich's opinion contradicts other substantial evidence in the record including his own treatment notes and the opinions of the consultative examiner and State agency physicians. As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* When opinions are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2). As such, the Regulations do not mandate that the ALJ accord Dr. Pribanich's evaluation controlling weight.

Plaintiff also contends that the "findings of Dr. Surber that the ALJ relied on and determined that they should be given controlling weight . . . are not credible with regard to claimant's ability to do work related activities, as these findings are not supported by the record as a whole." Docket No. 16. Specifically, Plaintiff argues that consultative examiner Dr. Surber only examined Plaintiff on one occasion which was two months before her laminectomy. *Id.*

Regarding Dr. Surber's functional assessment, the ALJ explained:

> The April 2007 functional assessment of Dr. Surber, the
> consultative examiner, is afforded controlling weight as it is
> consistent with the claimant's clinical exams, objective tests and
> electrodiagnostic scans, and conservative treatment. That is, Dr.
> Surber's functional assessment is more consistent with the weight
> of evidence in the record and with the claimant's hearing
> presentation. Dr. Surber opined that the claimant can occasionally
> lift or carry at least 10 to 20 pounds during up to one-third to one-
> half of an eight-hour workday. She would be able to stand or walk
> with normal breaks for up to two to four hours in an eight-hour
> workday, or sit with normal breaks for up to six to eight hours in
> an eight-hour workday. Accordingly, this functional assessment
> has been incorporated into the residual functional capacity outlined
> above.

TR 58.

While Plaintiff is correct in asserting that Dr. Surber examined Plaintiff prior to her back surgery, that does not diminish the value of Dr. Surber's opinion, as the ALJ, in his decision, noted that "the medical evidence indicates that the claimant had a *successful* lower back laminectomy on June 21, 2007." TR 55 (emphasis added). While acknowledging that Plaintiff reported to Dr. Pribanich in February 2009 that she experienced back pain and spasms after exercising, the ALJ also noted findings from Dr. Pribanich's post-surgery treatment notes showing that Plaintiff had full range of motion in her major joints and lumbar spine. *Id.* Thus, because the medical evidence showed that Plaintiff's back condition improved overall after her surgery, as explained by the ALJ, the value of Dr. Surber's pre-surgical findings are not diminished.

Because there is substantial evidence to support the ALJ's determination that the functional assessment of treating physician Dr. Pribanich was inconsistent with other medical evidence of record, and because the ALJ properly chose to accord more weight to the opinion of consultative examiner Dr. Surber, Plaintiff's argument fails.

15

## 2. Evaluation of the Combined Effect of All Impairments

Plaintiff contends that the ALJ failed to properly evaluate the combined effect of all her impairments, because the ALJ misstated evidence and failed to give proper weight to her foot and ankle pain, diffuse pain and fatigue, and migraines. Docket No. 16. Specifically, Plaintiff argues that her medical records demonstrate severe foot problems resulting from her navicular bone[4] that were never treated because she chose to forego a "very complex" and "risky" surgery to remove the bone and was unable to afford the recommended arch supports[5]. *Id.* Plaintiff also alleges that she suffers from complications from a previous ankle fracture including calcifications and osteophytes in her left ankle resulting in sensation loss, as well as a bone spur causing continued pain. *Id.* Regarding her complaints of diffuse pain and fatigue, Plaintiff claims that her pain and fatigue are related to an unspecified autoimmune disorder established by the symptoms of an elevated SED rate, myalgia, and arthralgia. *Id.* Plaintiff also argues that the ALJ "did not correctly characterize [her] migraine headache diagnosis" and incorrectly concluded that Plaintiff was not credible based upon the rationale that Plaintiff withheld symptoms. *Id.*

Defendant responds that "the ALJ did a complete analysis of all of [P]laintiff's impairments," and "evaluated the medical records as they related to her back problems, arthritis, bodyaches in hands and knees, left foot pain, mild degenerative disc disease, lumbago, obesity,

---

[4]Plaintiff asserts that the ALJ incorrectly characterized the ailments associated with her navicular bone as being ankle problems, rather than foot problems. Docket No. 16. This point will be discussed in greater detail at pages 18-19, *infra.*

[5]Plaintiff asserts that the ALJ misstated the cost of the recommended arch supports to cost $5.99 each, although the cost was actually $599.00 each. Docket No. 16; TR 25, 52.

foot pain and ankle sprain, stroke with possible right cerebral vascular accident and left-sided weakness, migraine headaches, high blood pressure, diabetes, depression, seizures, shortness of breath, and fibromyalgia." Docket No. 17. Defendant additionally contends that the ALJ properly evaluated Plaintiff's ankle injury, migraines, and chronic pain individually and in combination with her other impairments, and that the ALJ's mistake regarding the price of the recommended arch supports is harmless error. *Id.* Defendant maintains that, "[w]hile the ALJ must consider the combination of impairments, elaboration on the ALJ's conclusion is not necessary so long as it is clear that all of the impairments were considered as a whole." *Id.*, *citing Gooch v. Sec'y of Dep't of Health and Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).

Plaintiff correctly asserts that the ALJ must evaluate the combined effect of her impairments. *See* 42 U.S.C. § 423(d)(2)(B). Plaintiff, however, fails to show that the ALJ did not do so. Instead, Plaintiff simply maintains that there is medical evidence within the record that is contrary to the ALJ's decision which should have been given more weight. Docket No. 16.

The ALJ, in his decision, specifically addressed Plaintiff's complaints of ankle and foot pain. TR 51-52. The ALJ acknowledged that, in December 2006, Plaintiff complained of foot pain to Dr. Pribanich who noted that the left and right feet and ankles were within normal limits and had a normal range of motion, but that one ankle contained a "painful screw on palpitation." TR 51, 439-41. The ALJ also stated that:

> The claimant testified, at the hearing, that due to her right foot not mending after being broken; she finds it hard to stand on her feet. The medical evidence references a right ankle injury or sprain in 1995, with a prior sprain on the same ankle. In October 2004, the

claimant suffered a fracture of her right foot and was treated by Russell T. Garland, M.D. In 2007 James D. McKinney, M.D., treated the claimant's ankle without stating if it was the right or left ankle. Dr. McKinney mentioned previously treating the claimant's ankle in 1992, which was probably the right ankle. In January 1997, treatment notes from Susan N. Pick, M.D., referenced an injury to the claimant's left ankle, with ligament sprain and partial Achilles tendon tear. Within six months it was deemed to have reached maximum medical improvement and the claimant did not require any further medical or any surgical treatment.

At the hearing the claimant testified she had to stop work in 2005 as a convenience store cashier as it was hard to stand on her right foot. In contrast, she further testified that she drives a car (which calls for applying foot pressure) for errands such as going to the grocery and to the doctor. The claimant consulted an orthopedic specialist in February 2007, about uncomfortable fullness in the medial ankle. Dr. McKinney, the orthopedic specialist, did not recommend any treatment. Rather, Dr. McKinney stated that if it was persistently bothersome or got worse, he could do a minor surgical procedure. The medical evidence did not indicate any further treatment for the claimant's feet. At the hearing, the claimant additionally testified she still has problems with her foot. . . .

TR 51-52 (internal citations omitted).

Additionally, when determining whether Plaintiff's ankle and foot impairments met or equaled a listing, the ALJ explained:

The undersigned has also considered the claimant's ankle problems under the requirements of: (1) Section 1.02A of the listed impairments, dealing with major dysfunction of the joints, with involvement of one major peripheral weight-bearing joint, resulting in inability to ambulate effectively; and (2) Section 1.03 of the listed impairments, dealing with reconstructive surgery or surgical arthrodesis of a major weight-bearing joint with inability to ambulate effectively, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset. However, the consultative medical examiner found, in April 2007, the claimant had full and unlimited range of motion in her ankles, with no areas of decreased sensations to light touch involving her

feet; had palpably non-tender ankles; and used no type of assistive device for a slight limping antalgic gait. A report from an orthopedic surgeon's consultation with the claimant, in February 2007, did not mention any inability to ambulate effectively. Also, an evaluation by a physical therapist (a non-medical source), on July 18, 2007, indicated that, post-operatively, the claimant was up moving around, standing and ambulating, and doing quite well. Accordingly, the claimant's impairment does not satisfy the requirements of Sections 1.02A or 1.03 of the listed impairments.

TR 55 (underlining in original).

Plaintiff's contention that the ALJ incorrectly characterized the problems associated with her navicular bone as relating to her ankle rather than her foot is immaterial, as this fact does not change the ALJ's analysis of Plaintiff's ailments. As can be seen, the record clearly shows that the ALJ considered the medical evidence pertaining to Plaintiff's navicular bone (including Dr. Garland's treatment records) and foot pain, as well as Plaintiff's ankle pain, as discussed above. TR 55, 57, 51-52. Furthermore, the ALJ considered that Plaintiff chose to forego the elective foot surgery and was unable to afford the arch supports in determining the severity of Plaintiff's complaints of foot pain. TR 52. That the ALJ may have misstated or misunderstood the price of the recommended arch supports does not undermine the substantial evidence supporting the ALJ's conclusion. In the ALJ's third finding of fact, he concluded that Plaintiff's residual foot pain is a severe impairment, albeit not a severe impairment that satisfies the Listing under Sections 1.02A or 1.03 for major weight-bearing joints. TR 50, 55.

Plaintiff's contention that the ALJ erred in failing to acknowledge her complaints of diffuse pain and fatigue as resulting from an unspecified autoimmune disorder is not supported by the medical evidence. The ALJ heard Plaintiff's testimony about being misdiagnosed with Crohn's disease and inquired about Plaintiff being tested for trigger points. TR 54, 29.

Additionally, as is demonstrated below, the ALJ considered Plaintiff's complaints of chronic pain and evaluated the medical evidence associated with fibromyalgia. TR 54, 55-56.

In considering whether Plaintiff's allegations of chronic pain constituted a severe impairment, the ALJ stated as follows:

> As for chronic pain, at the hearing, the undersigned asked the claimant whether she ever had a diagnosis of fibromyalgia. The claimant's response was negative and she responded she had been misdiagnosed with Crohn's disease around 2000. The claimant further testified that a doctor had looked for "trigger points," indicative of fibromyalgia, only on her hips. The evidence only shows subjective complaints. Moreover, there is nothing in Dr. Surber's report, or the record as a whole, indicating a diagnosis and/or treatment regime for chronic pain or fibromyalgia.

TR 54.

Moreover, when determining whether Plaintiff's alleged chronic pain met or equaled a listing, the ALJ explained:

> The claimant's allegation of fibromyalgia was deemed a non-severe impairment in the above discussion. Consequently, there is no need to consider the claimant's allegation of fibromyalgia under the requirements of Section 14.01 (immune system), specifically Section 14.09 (inflammatory arthritis). Additionally, the medical evidence of record does not establish that the claimant has a history of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflammation or deformity in two or more major joints resulting in inability to ambulate effectively or inability to perform fine and gross movements effectively. Although a "Medical Assessment of Ability to do Work-Related Activities (Physical)" by Dr. Pribanich was submitted post-hearing and reports medical findings of osteoarthritis and fibromyalgia, among other things; there is not an explanation or summary of objective findings for this diagnosis. There is nothing else in the medical evidence to support the allegation of fibromyalgia. Accordingly, the claimant's alleged impairment does not satisfy the requirements of Section 14.01 of the listed impairments.

TR 55-56.

Ultimately, the ALJ found that Plaintiff's allegations of chronic pain did not constitute a severe impairment, and his conclusion is supported by substantial evidence.

The ALJ also discussed Plaintiff's migraines and seizures in his decision. Regarding Plaintiff's migraines, the ALJ stated:

> The claimant testified that she had three light strokes; and, the last one was around 2004. In April 2004, Dr. Pribanich treated the claimant for a possible right cerebral vascular accident (CVA) with left-sided weakness, with possible relation to recent headaches. Dr. Pribanich opined that the claimant may have had some type of migraine variant; and since the headaches seemed to have resolved, there could have been a relationship to cerebral vascular accident. After a neurological consultation, Stephen S. Chung, M.D.'s impression was that the claimant had a complicated migraine, most likely with left-sided hemiplegia. . . .
>
> In regard to the claimant's migraine headaches, Dr. Chung had prescribed daily medications in 2004. Dr. Chung assessed the claimant was better in September 2004 and that by December 2004 she had improved. However, the claimant continued to work. The claimant's physical examinations with Dr. Pribanich during 2008 and 2009 were unremarkable for any findings, diagnoses, or treatment for migraine headaches, except for noting the claimant's continuing use of daily Topamax medication. At the hearing, the claimant testified that in 2008 her migraines were severe enough for her to seek medical treatment. But, the record shows no treatment other than medications.

TR 52 (internal citations omitted).

Regarding Plaintiff's seizures, the ALJ stated:

> The claimant testified that she is prescribed seizure medication, and admitted it is for treatment of her migraine headaches. She explained that she was told her last seizure (the evidence shows around 2004) was due to her severe migraines. The claimant further alleged that she has about three seizures times per month. As for other specific treatment, the claimant stated she mostly goes into a dark room and lies down in quietness. However, the claimant did not allege a seizure disorder or discuss seizures with the consultative medical examiner in April 2007. Nor did the

21

claimant indicate any seizures on the "new patient medical questionnaire" for Dr. Scott Standard in June 2007, considering there was clearly a category for "seizures." Nor do the treatment notes reflect that the claimant discussed seizures in follow-up physical examinations with Dr. Pribanich in 2008 and 2009. It is notable that the claimant's condition in regard to migraines with left-side weakness was considered "stable" in 2004 which is prior to the seizure medication for her migraines, there is not a diagnosis for seizures or reports form objective tests to confirm them in the record. Nor has the claimant been placed under a treatment protocol for seizures by any treating physician. Therefore, the claimant's allegation of seizures is not a severe impairment.

TR 54 (internal citations omitted).

Plaintiff's argument that the ALJ "completely misstated the diagnosis of migraine headaches as a seizure disorder" fails because the ALJ properly considered all the medical evidence and Plaintiff's testimony regarding those symptoms. In her testimony, Plaintiff discussed her migraines and seizures together, and admitted that they are causally related. TR 26. The ALJ, in his decision, addressed Plaintiff's migraines and history of seizures in a similar fashion, and concluded that Plaintiff's migraine headaches (not seizures) constitute a severe impairment. TR 50, 52, 54. Although Plaintiff emphasized her migraine headaches as the primary ailment affecting her, the ALJ also considered the extent of her seizure disorder and whether that condition constituted a severe impairment, as noted above. While the ALJ noted instances in which Plaintiff did not inform her physicians of her seizures, he did not arbitrarily reject Plaintiff's credibility for withholding symptoms; rather, he considered this information in determining the severity of Plaintiff's seizures as an impairment separate from her migraine headaches. The record simply does not show that the ALJ misunderstood the medical evidence or Plaintiff's testimony regarding her migraine headaches and seizures.

As can be seen, the ALJ, in his decision specifically discussed Plaintiff's foot and ankle

pain, diffuse pain and fatigue, and migraines.  The ALJ specifically noted, *inter alia*, that he considered the claimant's ankle problems under the requirements of Section 1.02A and Section 1.03 and concluded that Plaintiff's impairment did not satisfy the requirements of either section. TR 55.  The ALJ also noted that he chose not to consider Plaintiff's allegations of fibromyalgia under Section 14.01 or Section 14.09 because he had determined this impairment was non-severe and there was no medical evidence to support Plaintiff's allegation of fibromyalgia, other than Dr. Pribanich's Medical Assessment which lacked an explanation or summary of objective findings for his diagnosis.  TR 55-56.  Contrary to Plaintiff's assertions, the ALJ did not err in failing to find that Plaintiff's other ailments, in combination, rendered her disabled.  It is clear from the ALJ's articulated rationale that the ALJ considered the record as a whole in evaluating the combined effect of Plaintiff's impairments.  Substantial evidence supports the ALJ's determination that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing; the ALJ's decision, therefore, must stand.

### 3.  Listing 1.04A

Plaintiff argues that the ALJ erroneously concluded that Plaintiff does not have an impairment or combination of impairments that meet or equal a listing.  Docket No. 16. Specifically, Plaintiff asserts that the medical evidence shows that the she meets the criteria of Listing 1.04A.  *Id.*  As support for her argument that she meets Listing 1.04A, Plaintiff notes the condition of the discs in the lumbar region of her spine and the severity of her leg pain.  *Id.* Plaintiff also alleges that the ALJ misinterpreted and misstated the medical evidence concerning these ailments.  *Id.*

Defendant responds that the ALJ properly evaluated the medical evidence of record and

correctly concluded that Plaintiff does not satisfy the criteria of Listing 1.04A. Docket No. 17. Additionally, Defendant maintains that there is substantial evidence supporting the ALJ's conclusion. *Id.*

Listing 1.04A concerns disorders of the spine or the spinal cord, and requires: "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscles weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting or supine)." 20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 1.04A.

The ALJ concluded that Plaintiff "does not have the gravity of symptoms nor medical documentation required in order to establish a physical impairment of listing level security." TR 55. Regarding Listing 1.04A, the ALJ noted that: (1) there was no evidence of nerve root compression after Plaintiff's "successful lower back laminectomy"; (2) even before the laminectomy, Plaintiff could perform both straight leg raises (in the sitting and supine positions), and right and left one leg stances; and (3) after the laminectomy, Plaintiff's musculoskeletal range of motion of all major points was within normal limits, and Plaintiff had full range of motion of the lumbar portion of her spine. *Id.*

Plaintiff argues that the results of her June 11, 2007 MRI demonstrate her disc herniation and nerve compression. Docket No. 16. The June 11, 2007 MRI was, however, performed before her laminectomy to correct these conditions occurred on June 21, 2007. TR 518, 520. Thus, this MRI is not indicative of Plaintiff's spinal condition at the time of her hearing.

Additionally, Plaintiff claims that the ALJ "did not accurately describe [her] back treatment and diagnoses" in determining that she did not meet the criteria of Listing 1.04A.

24

Docket No. 16. Plaintiff supports this assertion by noting her focal disc protrusion at the L5-S1 contacting the nerve root, her back and leg pain, and the treatment notes from Dr. Scott Standard, her treating neurosurgeon. *Id.*

In his decision, the ALJ described the reported results of Plaintiff's May 2007 MRI which revealed the focal disc protrusion, and noted that it had occurred before Plaintiff's laminectomy. TR 51, 523, 526. The ALJ also noted Plaintiff's post-surgical back pain and considered that evidence, along with Dr. Pribanich's musculoskeletal measurements from the same examination. TR 51, 541-43. The treatment notes of Dr. Standard mentioned in Plaintiff's memorandum describing Plaintiff as barely able to walk or stand with a "significant antalgic gait" were made before Plaintiff's laminectomy and do not describe the condition of Plaintiff's spinal cord at the time of her hearing. Docket No. 16, TR 518-19.

Plaintiff also claims that the ALJ erred in his characterization of her degenerative disc disease as "mild and minimal," and in his assertion that she was not referred to a neurologist for consultation. Docket No. 16, TR 56.

The ALJ's characterizations of Plaintiff's degenerative disc disease as "mild and minimal" are derived directly from the post-surgery treatment records of Dr. Pribanich and Dr. Douglas Carpenter, and were evaluated in the context of Plaintiff's spinal condition after the laminectomy. TR 56, 536-52. Furthermore, while it is true that Plaintiff did see a neurosurgeon, as noted by the ALJ, the record shows that she was not referred to a neurosurgeon after her surgery. TR 51. Thus, the ALJ did not err in his characterization of the medical evidence.

As can be seen, the ALJ acknowledged that the medical evidence showed disc herniation and nerve root compression before the laminectomy. TR 51. The ALJ, however, concluded that

the laminectomy was successful in correcting the herniation and compression, and that Plaintiff's post-surgical residual back stiffness and pain, muscles spasms, and musculoskeletal limitations do not satisfy the criteria of Listing 1.04A. TR 55-56. The ALJ's conclusion is supported by substantial evidence; Plaintiff's argument fails.

## 4. Residual Functional Capacity

Plaintiff maintains that the ALJ improperly evaluated her residual functional capacity because the ALJ's determination of her physical and mental abilities was not supported by substantial evidence. Docket No. 16. As discussed above, Plaintiff relies heavily on the functional assessment provided by her treating physician to support this contention.

Defendant responds that the ALJ properly considered all of the medical evidence in assessing Plaintiff's residual functional capacity, and that his conclusion is supported by substantial evidence. Docket No. 17.

"Residual functional capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c). With regard to the evaluation of physical abilities in determining a claimant's residual functional capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(b).

In determining Plaintiff's residual functional capacity, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." TR 56. The ALJ asserted that the residual functional capacity provided in his fifth finding "is consistent with the evidence of record and the claimant's hearing presentation and testimony." *Id.* The ALJ provided the following rationale:

> The claimant's objective spinal scans and X-rays revealed only "mild" and "minimal" degenerative disc disease. The objective examinations for her ankle revealed no significant abnormalities. Her clinical exams did not reveal any significant neurological or motor deficits. She did not require any EMG or nerve conduction studies or referrals to neurologists. Following back surgery in 2007, the clinical examinations have not shown any abnormalities in the musculoskeletal system. Since then the record shows only conservative treatment with medication and physical therapy recommended. The claimant related having relief of her pain with medication and did not report any adverse side effects of prescribed medication.

TR 56-57.

As has been discussed in the analyses of the statements of error above, the record in the case at bar is replete with doctors' evaluations, medical assessments, and test results, all of which were properly considered by the ALJ in determining Plaintiff's "residual functional capacity for work activity on a regular and continuing basis." The ALJ, after evaluating all of the testimonial and objective medical evidence of record, along with Plaintiff's level of activity, determined that Plaintiff retained the residual functional capacity to perform light unskilled work. TR 56-59. The ALJ properly evaluated the evidence in reaching this residual functional capacity determination, and the Regulations do not require more.

Moreover, the ALJ's determination that Plaintiff retained the residual functional capacity to perform light unskilled work is supported by the State agency physicians' reviews of Plaintiff's medical records, the consultative medical examiner's functional assessment, and Plaintiff's reported daily and social activities. TR 58-59. In May and July of 2007, State agency physicians evaluated Plaintiff's medical records and determined that she was capable of a wide range of medium exertion physical activity. TR 58, 471-78, 498-505. The functional assessment of consultative medical examiner, Dr. Surber, indicated that Plaintiff could occasionally lift or carry at least ten to twenty pounds during up to one-third to one-half of an eight-hour workday. TR 58, 464-69. Dr. Surber's functional assessment also reported that Plaintiff could stand or walk with normal breaks for up to two to four hours in an eight-hour workday, or sit with normal breaks for up to six to eight hours in an eight-hour workday. *Id.*

Additionally, the ALJ noted that Plaintiff's "reported daily and social activities are not suggestive of a totally disabled individual." TR 59. As noted by the ALJ, Plaintiff reported that she could shower, do chores around the house, watch television, prepare meals, care for herself, drive a car, go out of the house alone, shop for groceries, spend time with others, remember her appointments, get along with others, go to church, and walk around the house for exercise. TR 59, 178-184. The ALJ also noted that Plaintiff "was able to follow the questions asked of her at the hearing and to formulate appropriate responses without undue delay or difficulty." TR 59.

Although Plaintiff's statement of error makes a general assertion that the ALJ's determination of her *physical and mental* residual functional capacity was not supported by substantial evidence, Plaintiff's memorandum only discusses her physical residual functional capacity. To the extent that Plaintiff contends that the ALJ erred in his consideration of

28

Plaintiff's mental abilities, the ALJ's decision specifically addresses the opinions of Mark Loftis, M.A., consultative psychological examiner, and Dr. P. Jeffrey Wright, State agency psychologist.  TR 53, 58-59, 459-62, 493-495.

The consultative psychological examiner determined, *inter alia*, that Plaintiff has reasonable cognitive skills and is capable of learning, has very sufficient recall, and has mild impairment of her cognitive abilities.  TR 53, 58, 459-62.  The examiner also noted that Plaintiff's depression is a factor in her ability to deal with daily living, and that she likely has a mild to moderate impairment in her ability to deal with stressors and interpersonal interactions within the work setting.  *Id.*

Regarding the State agency psychologist's assessment, the ALJ stated:

> Dr. Wright opined that the claimant had a depressive disorder and that the claimant would be able to understand, remember and carryout detailed, but not complex tasks; and that she will have difficulty but can sustain attention and concentration, keep to a schedule, maintain attendance, and complete a workweek.  Dr. Wright further opined that the claimant would have some difficulty working around others, including the general public, co-workers, and supervisors, but can do these things; and that she can handle changes in the work setting, set realistic goals, and avoid hazards in the work place.

TR 53.  The ALJ concluded: "This functional assessment is consistent with the medical evidence of record and with the claimant's hearing presentation.  Therefore, it is afforded significant weight."  *Id.*

The ALJ properly evaluated Plaintiff's mental residual functional capacity.  Because there is substantial evidence in the record to support the ALJ's physical and mental residual functional capacity determination, Plaintiff's argument fails.

**5.  Electronic File for Appeals Council**

Plaintiff also argues that she was "essentially denied proper processing of her claim at the appeal's council level," because the Notice of Appeals Council Action denying Plaintiff's request for review was accompanied by an updated exhibit list containing a submission from the attorney for another claimant with a social security number similar to Plaintiff's social security number.  Docket No. 16.  Plaintiff contends that the Appeals Council's decision to deny Plaintiff's request for review may have been based upon the material submitted by the other claimant.  *Id.*  Plaintiff states that after the Appeals Council was notified of the confusion, no further action was taken to ensure that Plaintiff's request for review had not been mistakenly denied.  *Id.*

Defendant responds that the material in question was only a cover letter from the other claimant's attorney, which would have had little or no bearing on the Appeals Council's decision (as opposed to material such as the other claimant's medical records, which could have materially affected the Appeals Council's decision).  Docket No. 17.  Because the material in question was only a cover letter, Defendant asserts that this mistake was harmless error.  *Id.*

In her Reply, Plaintiff maintains that it cannot be shown that the erroneously included submission was harmless because it was not removed until after Plaintiff contacted the Appeals Council and the Appeals Council denied Plaintiff's request for disclosure of the contents of the submission at issue.  Docket No. 18.

Plaintiff correctly asserts that it is possible that the Appeals Council may have viewed the erroneously included submission at issue.  The exact contents of the submission are unknown, but the nature of the contents is provided in the Exhibits List that is part of the "Notice of

Appeals Council Action" letter dated May 15, 2010. The Appeals Council Exhibits List clearly states that Exhibit 16E consisted of the "cover letter and representative brief" from Phyllis L. Robinson, who Plaintiff states is the representative for another claimant with a social security number similar to hers. Docket No. 16, TR 4, 5. Because the Appeals Council must base its decision on law and evidence, not argument, the inclusion of the "cover letter and representative brief" within the record for Plaintiff's claim is harmless error. Accordingly, Plaintiff's argument fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge